WILLIAM ZEIGLER AND SON, Plaintiff-Appellee, *v.* CHICAGO NORTHWESTERN DEVELOPMENT CO., Defendant-Appellant.

Second District   No. 78-62

Opinion filed April 27, 1979.

278

Wesley G. Hall, Jed Robert Mandel, and Russell J. Hoover, all of Jenner & Block, of Chicago, for appellant.

Paul E. Thompson, of Thompson & Thompson, of Long Grove, for appellee.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

This appeal arises out of an action by a plumbing contractor for breach of contract against his general contractor. A mechanic's lien count in the complaint was severed for a separate trial and is not involved in this appeal. The contract count was tried before a judge without a jury and a judgment for $85,354 plus costs was awarded to the plaintiff. In this appeal the defendant contends (1) that the plaintiff failed to prove that it performed or that the defendant breached the basic contract between the parties; (2) that the trial court's award of certain challenged extras is not

supported by the evidence, and (3) that the trial court's award of damages contained elements which were speculative and contrary to the manifest weight of the evidence.

The testimony developed at trial established that the plaintiff, William Zeigler and Son (hereinafter referred to as "Zeigler"), is a plumbing contractor who bid on the plumbing work for certain apartment buildings being constructed by the defendant, Chicago Northwestern Development Co. (hereinafter referred to as "Northwestern"). The written contract entered into between the parties in April 1973 provided that the plaintiff would do the interior plumbing, including installation, in 30 buildings, containing six apartments each, for $1550 per unit, or $9,300 per building, being a total of $279,000. The contract was silent as to change orders or extras. Work apparently progressed smoothly enough on the contract until about April 1974, at which time Zeigler complained about rising material costs. Zeigler's manager, Haviland, testified that in September or October of 1974, he spoke with Northwestern's field superintendent (LaBrant) concerning inclusion of these price increases in future billings and that LaBrant told him, "Yes, go ahead and put them in there and we will pick them up at the end." In December of 1974, Zeigler submitted an invoice, including an increase of $805 per building, reflecting such price increase on materials. Northwestern paid only the original agreed price and ignored the increased billing. Later that month, Zeigler submitted further bills outside the original contract covering certain extras, one invoice for trim on four buildings in the amount of $12,000 and other extras for sump pumps, dishwashers, frost-proof sill cocks and gas piping, totaling in all $27,222. Zeigler said all of these items were due at that time but Northwestern paid only a major part of the invoice for trim and did not pay the other extras.

Certain "additional work authorizations" were submitted by Zeigler between April 3, 1973, and November 1974, but some of these were not signed as being authorized by Northwestern. These, together with some price increases and some items disputed as to whether or not they should be considered as being included in the original contract figure, were not paid by Northwestern and by June of 1975 there was $40,000 for which invoices had been rendered and which had not been paid. Some of these items were apparently still under discussion while others were flatly denied by Northwestern as being unauthorized extras and price increases which were not included in the original contract price. The difference between the parties was further augmented in August of 1974, when a dispute arose over the basis of payment for the plumbing work for a pool house, Zeigler claiming the agreed price was $10,700, whereas Northwestern apparently claimed that it had rejected that bid and that

the agreement (oral) had been for the work to be done on a time and material basis. Thus, by September 1975, there were unpaid Zeigler invoices in the amount of around $50,000.

At that point, Zeigler threatened to quit work. Haviland, Zeigler's chief executive officer, met with Northwestern's representatives and informed them that "the only way it was going to go back on the job" was if its invoices to Northwestern "were satisfied." According to the testimony of Haviland, he was told the invoices would be paid. However, the disputes continued as to certain items, which remained unpaid and Zeigler did not return to the job.

So far as we can discern from the testimony and a summary sheet covering the plaintiff's exhibits, at the time Zeigler ceased work on the contract, Northwestern had paid some $161,000 on invoices rendered by Zeigler. Of these there were approximately $51,000 or $52,000 outstanding and unpaid invoices, including disputed increases and materials furnished and work performed as extras and which were disputed by Northwestern as being either unauthorized or as included in the original contract price. These invoices carried dates from February 1974 to August 1975. The largest items were those involving sump pumps and extra sill cocks, rendered in December of 1974, and the pool house (later withdrawn as a disputed item) which was rendered in August of 1975.

■■ Northwestern tried to persuade Zeigler to return to the job without success. In November of 1975, Northwestern wrote to Zeigler pointing out that certain buildings had not been completed and asking Zeigler to return to finish these buildings otherwise Northwestern would have no alternative but to secure another contractor to complete the work. These letters were apparently ignored. Zeigler filed suit against Northwestern in March of 1976, alleging breach of contract and included as damages not only the unpaid invoices (somewhat adjusted), but also loss on materials bought and fabricated for the particular job and for loss of profits. We note that Zeigler's complaint filed in March of 1976 alleges that Northwestern "in violation of its agreement with the plaintiff, hired another plumbing contractor to continue work agreed to be accomplished and paid for under the agreement dated April 3, 1973 * * *." However, in view of Zeigler having taken the initiative to remain off the job, the hiring of another contractor by Northwestern, after written notice and request to Zeigler to return to the job, cannot be regarded as a breach of contract in and of itself. Zeigler's theory is actually based on a breach of contract for failure to pay open invoices within a reasonable time after they were rendered. The prayer for damages included approximately $51,900 for unpaid invoices, $58,000 for unused materials and $30,000 for loss of profit, totaling almost $140,000.

In the trial, three categories of disputed items emerged on which damages might be based, conceding that there was a breach of contract for which such damages would be proper. These were: (a) the disputed invoices; (b) the loss on unused materials purchased or fabricated for the particular contract, and (c) loss of profits. At the conclusion of the rather voluminous evidence involving details of many disputed items, the court awarded Zeigler $85,354 as damages for breach of contract. While the total amount of the judgment cannot be exactly reconciled in a breakdown of the claim, it consisted roughly of $30,700 for unused materials, $10,580 for profit and something over $44,000 for disputed unpaid invoices. Some $15,000 of these invoices is not contested on this appeal. The balance amounting to a little less than $29,000 was allowed by the trial court for work and materials furnished in the performance of the work either by oral agreement of the parties or by code requirements not set out specifically. Thus, the trial court not only found for the plaintiff in connection with the major part of the disputed invoices, but also awarded the plaintiff damages for loss of profit and unused materials, as part of the damages for breach of contract.

■■■ We consider first the defendant's contention that the plaintiff failed to prove that it performed or that the defendant failed to perform the basic contract between the parties. The contract is silent as to change orders or extras, making no reference to such contingencies. Where the written contract contains no provision as to authorization for such extras, or how or when they shall be paid for, an oral request by one party for such extra work to be performed and its performance by the other party, does not add to or alter the basic contract between the parties, as to its essential terms. While the extras merit reasonably prompt payment after they have been performed, we cannot say that reasonably prompt payment of invoices within the written original contract, accompanied by a failure to promptly acknowledge and pay for invoices submitted for work which was not provided for in the original contract, and for which there is no written authorization, can invalidate the whole contract and place the contractor in a position to repudiate the entire contract and demand damages for its breach.

■■ The burden, we think, is on the contractor who performs the extra work not delineated in the original contract to prove that it was either not part of the original contract requirements or that it was specifically requested by the owner subsequent to the original contract, before nonpayment for such additional work can be regarded as a breach of contract.

In the much quoted case of *Watson Lumber Co. v. Guennewig* (1967), 79 Ill. App. 2d 377, 394, the court clearly defined the situation of the contractor performing additional or extra work:

"The contractor must make his position clear at the time the owner has to decide whether or not he shall incur extra liability. Fairness requires that the owner should have the chance to make such a decision. He was not given that chance in this case in connection with all of these extras. Liability for extras, like all contract liability, is essentially a matter of consent * * *."

■ Thus, the contractor who performs work not within the terms of the specifications of the basic written contract without an authorization from the owner is not foreclosed from payment, if he can prove either that the owner (in this case, the general contractor) agreed to such work or that it was contemplated by the parties, either in fact or in law (as, for instance, by the code requirements of the community). But, the contractor carries the burden of proving that the parties intended that he be paid for such work over and above the agreed original price. As the court said in *Castle Concrete Co. v. Fleetwood Associates, Inc.* (1971), 131 Ill. App. 2d 289, 293-94:

" 'In a building and construction situation, both the owner and the contractor have interests that must be kept in mind and protected. The contractor should not be required to furnish items that were clearly beyond and outside of what the parties originally agreed that he would furnish. The owner has a right to full and good faith performance of the contractor's promise, but has no right to expand the nature and extent of the contractor's obligation. On the other hand, the owner has a right to know the nature and extent of his promise and a right to know the extent of his liabilities before they are incurred. Thus, he has a right to be protected against the contractor voluntarily going ahead with extra work at his expense. He also has a right to control his own liabilities.' "

■ Having established these principles we now turn to the details of the plaintiff's claim. We think for purposes of this appeal the claim can be divided into two categories: (a) the disputed item as to work and material actually expended on the job and (b) damages for loss of profits and loss of materials bought for or fabricated for the job but not used. Category (a) originally totaled around $50,000 (at the time of the trial); however, with adjustments for duplications and overpayments the net total on the "contested" items in this category was $43,857.16, which was the amount allowed by the trial judge. Of this amount, Northwestern has conceded certain items as extras which were actually performed, although not signed for in writing, amounting to about $4,800 and, in addition, is no longer contesting the item of $10,700 for a pool house; thus, $15,000 is not contested, leaving $28,448 in contested items of extras. The major part of this figure is made up of $6,300 for rough-in of a building which was left unfinished, $14,780 for a second sump pump in each unit, and $7,488 for a

second sill cock in each apartment. We think the $6,300 item is far from clear since it was only partial performance, but the work was done before a legitimate dispute arose, and we are inclined to go along with the trial court in allowing this item as proper. On the other hand, according to the *Watson Lumber Company* standard, we are not in accord with charging the cost of an extra sill cock in each apartment to Northwestern. The contract called for only one sill cock per apartment, so far as we can tell, and there was no persuasive evidence that Northwestern ordered or agreed to pay for a second sill cock. Nor do we see any evidence that Northwestern, by its conduct, waived its right to object to this item, as was found to be the case in *Strom v. Lipschultz* (1972), 5 Ill. App. 3d 308, and *Salomon-Waterton Co. v. Union Asbestos & Rubber Co.* (1931), 263 Ill. App. 583. Neither was there any evidence that the second sill cock was required by the city code. We, therefore, see no basis for the trial court's allowance of this item in the amount of $7,488. Other, smaller items, allowed by the trial court appear to have been approved or ordered in advance by an authorized individual at Northwestern and where the extra-work invoice indicated the date ordered and the individual who ordered the work, we think the *Watson Lumber Company* requirements for extra work might, as the trial court found, be deemed to have been waived in those cases in accordance with the cases cited above where a waiver was found.

■■ ■ The most substantial and controversial item in this category of disputed work is the charge of $14,784 for sump pumps. Northwestern contends that (a) the plans on which the bids were based called for one sump pump and (b) that it never authorized a second sump pump as an extra and was never advised in advance of a second sump pump being furnished. Since, they say, the working plans show a second sump pump, two sump pumps should be considered as part of the original agreement and no payment should be expected for the extra one. Zeigler, however, sees it quite differently. They point out that the original written contract refers to "J.C.O. Ludwig" plans, and upon referring to these plans it is clear that only one sump pump per unit is specified. While there was testimony to the effect that actually the J.C.O. Ludwig plans were not the ones intended to be used on the particular job and actually the work was performed according to other plans prepared by National Homes, which were the original actual working plans, this controversy was not resolved. However, the testimony which was adduced clearly proved that the Waukegan City Building Code required, under the anticipated operating conditions, two sump pumps for each unit, since a separate sump pump was required for storm water drainage where, as indicated in the plans, the laundry water was to be discharged into the sewer by means of a sump pump. One sump pump could not handle both since they must be

discharged separately. The same conditions apply here as were true with the sill cocks so far as prior and written authorization was concerned. However, we are not inclined to apply the *Watson Lumber Company* standard. While the plans referred to in the basic written agreement only called for one sump pump, it seems probable from the fact that the plans indicate drainage tile "to the sump pump," that the original intention was to have the sump pump indicated in the plans handle only storm water; that is, water from the drainage tile. It was also the intention to have the laundry water discharged by the single sump pump line but this would be a violation of the City of Waukegan Code. Thus it appears that it was either intended to provide a system that required two sump pumps, or it was the intention to violate the city code. Since we will not assume the latter and will not enforce such a contract in any event, we feel that the logic of the situation compels the recognition of Zeigler's claim for the second sump pump, whether it was originally called for in the plans or not. This appears to be in accordance with the general rule as enunciated in Annot., 2 A.L.R. 3d 643 (1965), where it is said:

> "All the cases agree that a stipulation requiring a written order for extras or alterations is not applicable to work done in order to comply with an order of a public building inspector."

Thus, we differ with the trial court's allowance on the disputed invoices only as to the $7,488 item for extra sill cocks, which so far as we can discover from the record, were not ordered or authorized by Northwestern nor necessitated by the Waukegan Building Code.

This brings us to a consideration of that part of the trial court's judgment pertaining to allowance for materials bought or fabricated by Zeigler for the job, but not used, and also the claim for loss of profits. Any consideration of these items must first be predicated on a finding that Northwestern substantially breached the contract and thus gave Zeigler the right to rescind it and sue for damages. Zeigler's theory is that on a total contract of $279,000 in work and materials, overdue invoices of over $50,000 was such an arrearage as to constitute a substantial breach of the contract, entitling Zeigler to the right to rescind and sue for damages. Northwestern, however, points out that $161,000 had been paid on the contract and that practically all of the arrearage was with respect to work which was clearly extras under the original contract or about which there was a legitimate dispute as to cost, as to the performance of the work or as to whether it was authorized by Northwestern. Zeigler claims that at the time they walked off the job (in the beginning of September 1975), there was over $51,000 in invoices which were overdue. However, reference to the individual invoices correlated with the testimony developed by direct and cross-examination reveals as part of that total (1) an invoice of $27,222 dated December 31, 1974. This invoice contained $14,780 for extra sump

pumps which were not a part of the original contract and which were not requested or authorized by Northwestern and which we are allowing here after some discussion and because such second sump pump was required by the city code of Waukegan, in the event it was desired to drain both the storm water and the laundry water by sump pump; (2) it also included an item of $2,664 for gas piping which was never authorized by Northwestern as an extra and which the trial court disallowed, and (3) it also included an item of $7,488 for sill cocks which we are here disallowing as not being covered as extra work under the *Watson Lumber Co.* standard. Thus, almost $25,000 of the $27,222 invoice referred to was legitimately open to question. In addition to this invoice, there were also outstanding invoices—all for extras—totaling $2,041.72, which were quite old. However, three of these were open to question, one of them being for $1,019.07 for work on the private residence of a Northwestern official, not part of the job in question here. This was later disallowed as part of the claim. There were also two other items amounting to $272.50 for which work had not been authorized in writing.

Proceeding with this analysis, we find that another invoice dated December 31, 1974, was admittedly overbilled to the extent of $1,500. The total of $51,955 claimed by Zeigler to be overdue in September 1975, when they quit the job, also included a very disputable item, only about 30 days old. This item was in the amount of $10,700 for the pool house. The dispute in connection with this item was eventually resolved in favor of Zeigler, but the testimony of the witnesses indicates a legitimate difference of opinion as to the item, which Zeigler claimed was a contract priced extra but which Northwestern contended was agreed by Zeigler to have been done on a time and material basis for $4,800.

■■ Thus, of the $51,955 claimed by Zeigler to be overdue at the time they elected to walk off the job it appears that some $43,000 was legitimately questioned by Northwestern, several of the charges being clearly improper. In the light of this analysis—Northwestern having paid some $161,400 on the main contract—it seems questionable whether Zeigler had grounds for rescinding the contract and recovering damages for the breach at the time they left the job in September 1975. It must be remembered that the uncontradicted testimony of Haviland, Zeigler's vice-president, was that Zeigler was demanding immediate payment of the entire outstanding balance of the invoices at the time and Zeigler refused to return to work unless all of these outstanding invoices were paid. Since, as we have indicated, some of the charges were clearly improper and others reasonably disputable (and they appeared to be all lumped together in Zeigler's demand), it was apparently not a flexible situation where some of the items could be negotiated and others laid aside while the work progressed. Considering all of these circumstances,

we do not regard Northwestern's failure to pay all of the open invoices Zeigler had billed—practically all of which were for extras—as amounting to a default which gave Zeigler a right of rescission with damages for breach of contract.

■■ Since we are not inclined to regard Northwestern's failure to accede to Zeigler's demand for immediate payment of all outstanding invoices as a breach of contract, we see no damages accruing to Zeigler for the value of materials furnished and not used on the job or abandoned at the site or bought and not used. It is Zeigler's contention that some of the material, such as pipes and fittings, was specially made for this particular job and the labor of doing so is wasted and the material is worth, at best, only its salvage value and in some cases only junk value. We think this claim has a dubious basis in fact because the testimony establishing the minimum value of the material was quite speculative. We see no basis for it in law, in any event. There is nothing in the contract between the parties requiring Zeigler to prefabricate the material to be used on the job, nor is there any indication that this possibility was anticipated and its results considered by the parties. While it may be the custom of the trade to prefabricate some pipes and fittings, we are sure there is no custom whereby the owner or general contractor is beholden to the subcontractor for the cost of such material if the subcontractor later voluntarily abandons the job. It appears to us that Zeigler attempted to save money by prefabricating certain material off site in advance. When Zeigler elected to walk off the job and refused to return, after a request that they do so, the burden of already having an inventory of materials prepared cannot automatically be cast on Northwestern's shoulders.

■■ ■ We also reject the claim for loss of profit on two grounds. In the first place, the testimony was clearly to the effect that Zeigler had underbid on the contract or perhaps had not correctly anticipated the effect of inflation, and it seems probable that on the basis of the contract price of $9,300 per apartment building, he would not have realized the originally anticipated profits. The witness Haviland's calculation of 10% profit, if he had elected to finish the contract, seems entirely unwarranted in view of the testimony. In any event, it was Zeigler's decision to abandon the contract and in view of the uncertain prospects for a profit, if they had continued, we see no justification for awarding them a profit they did not establish they could have made, as a recompense for their unilateral decision to abandon the job. In the recent case of *Rivenbark v. Finis P. Ernest, Inc.* (1976), 37 Ill. App. 3d 536, 538-41, the court said:

> "There are three general principles which courts apply to determine when lost profits will be allowed as compensation in contract cases. Lost profits will be allowed only if (1) their loss is proved with a reasonable degree of certainty [citations]; (2) the court is satisfied that the wrongful act of the defendant caused the

loss of profits [citation]; and (3) the profits were reasonably within the contemplation of the defaulting party at the time the contract was entered into * * *.

* * *

To determine lost net profits, Mrs. Rivenbark calculated the percentage of profit on the work completed ($48,330.09 ÷ $144,461.37 x 100 = 33 + %) and projected that plaintiff's profit on the uncompleted portion of the contract would have been of an identical percentage if the work had been completed. Taking 33 + percent of the difference between the total contract price ($218,632.29) and the contract price of the work completed ($144,461.37), which equals $74,170.92, plaintiff's wife thus arrived at the figure of $22,385.17 for lost profits.

We find this figure erroneous because plaintiff's witness employed an incorrect method of calculation of lost profits. Plaintiff presented no evidence of the projected cost of completion of the work. There was no testimony regarding anticipated direct costs (labor and material), indirect costs (overhead and other expenses) or how long it would have taken to complete the contract. Without such testimony the proper amount of lost net profit cannot be ascertained. It may be that plaintiff's cost of completion would have been greater than the contract price for the work remaining. In this instance, plaintiff would not be entitled to any lost profits. On the other hand, plaintiff's estimate may well approximate a fair amount of anticipated profits lost as a result of defendant's breach. Under these circumstances we conclude that the court erred in awarding lost profits in the manner calculated."

In the case before us, profits were quite uncertain and the only evidence on that score was Haviland's statement that Zeigler had expected to make a profit of around 10% out of the job. That this was optimistic is indicated by Haviland's letter of August 30, 1974, to Northwestern, stating that Zeigler's costs for materials had increased by $217 per unit since the contract was signed and that it was necessary for him to bill for extra material costs. This claim was, of course, not allowed by the trial court.

The quoted remarks from *Rivenbark* apply with equal or greater force to the case before us. In *Rivenbark*, the defendant conceded that he had materially breached the contract. In the case we deal with here it was the plaintiff who abandoned the job and refused to return to it and the defendant not only does not concede that he breached the contract, but as our analysis of the outstanding invoices indicates, some items of open invoices for extras were open to question and were not substantiated to the extent that would constitute a breach of contract, especially in view of the plaintiff's ultimatum that work would cease unless *all* open invoices,

including disputed extras, were immediately paid, followed by the plaintiff's abandonment of work and refusal to return upon request.

Moreover, the further requirement that the loss of profits be proved "with a reasonable degree of certainty" as indicated in the *Rivenbark* case, was not satisfied in the case before us. Actually, the only evidence about lost profits was the testimony that in Haviland's negotiations with LaBrant of Northwestern, he had figured "an anticipated" profit of 10% on each building. However, in a pretrial deposition he answered the inquiry as to whether he had in actual practice realized that amount of profit by saying, "Absolutely not." In addition, it should be noted that one of the open invoices which was rejected and was a matter of dispute between the parties, contained an item of $3,906 for price increases on 18 of the units which was considered an extra. This increase was eventually entirely disallowed by the trial court.

We conclude, from all of the evidence, that the claimed profit was not established, and it appears to us that in any event it was not clear that it was the wrongful act of Northwestern that caused whatever loss of profits there may have been if the contract had been concluded on the original terms. Rather, it was the action of Zeigler in withdrawing from the contract after its demand for full payment of all disputed items was not met which caused the cessation of work. This may have excused them from further performance until the matter was adjusted satisfactorily, but we see nothing to justify an award of the originally anticipated profit of 10% as damages.

We see no need to reverse and remand the case for a new trial. Instead, pursuant to Supreme Court Rule 366 (Ill. Rev. Stat. 1977, ch. 110A, par. 366), we modify the judgment of the trial court by reducing that judgment as follows:

> (1) The trial court's allowance of extras is reduced by $7,488, the invoice for extras for sill cocks. As indicated above, we find no authorization for this item and there is no indication that extra was required by the city code;
>
> (2) The trial court's allowance of $30,703.28 for unused material and $10,580 for loss of estimated 10% profit on the job is disallowed for the reasons stated above.

The total judgment is thus reduced to the difference between the total of the items set out in (1) and (2) above and the trial court's award of $85,354 and costs, leaving a net judgment of $36,582.72 and costs.

Thus modified, the judgment of the circuit court of Lake County is affirmed.

Affirmed as modified herein.

GUILD, P. J., and WOODWARD, J., concur.