**PACIFIC MAILING EQUIPMENT CORPORATION, Plaintiff,**

v.

**PITNEY BOWES, INC., Defendant.**

**PACIFIC MAILING EQUIPMENT CORPORATION, Plaintiff,**

v.

**PITNEY BOWES, INC., United States Leasing Company, PB Leasing Corporation, Defendants.**

**Nos. C–75–2673–WWS, C–80–0067–WWS.**

United States District Court, N. D. California.

July 7, 1980.

On Offer of Proof Sept. 25, 1980.

Sullivan, Jones & Archer, San Francisco, Cal., for plaintiff.

Brobeck, Phleger & Harrison, San Francisco, Cal., for defendants.

## MEMORANDUM OF OPINION AND RULING ON ISSUE OF MARKET AND MONOPOLY POWER

SCHWARZER, District Judge.

*Procedural and Factual Background*

Plaintiff brings this action under Section 2 of the Sherman Act (15 U.S.C. § 2), alleging that defendant monopolized and attempted to monopolize trade in mailing machines.[1] The action was filed in 1975. After extensive discovery and pretrial proceedings it went to trial before Judge Wol-

---

1. It is not necessary, for purposes of this ruling, to consider pendent claims asserted under state law, defendant's counterclaim, or Civil Action C-80-0067-WWS subsequently filed by plaintiff against defendant.

lenberg and a jury in September 1979. After 33 trial days, before plaintiff had completed presentation of its case, the court declared a mistrial and recused himself. The case was subsequently reassigned, first to Judge Orrick and then, on June 17, 1980, to the undersigned.

On June 20 and 26, 1980, preliminary pretrial conferences were held to discuss subsequent proceedings. The Pretrial Order, a copy of which is attached as Exhibit A, was entered without objection. On July 24, in a conference between court and counsel, paragraph 3(a)(iii) of that order was further clarified to the effect that the Court would make findings of fact and conclusions of law on the issue whether defendant possessed monopoly power, i. e., the power to control prices or exclude competition in the relevant market in which plaintiff and defendant competed.

Pursuant to the provisions of paragraph 3 of the order, the parties made written submissions prior to the hearing. Plaintiff filed a trial memorandum regarding the monopoly power issue, incorporating references to testimony and exhibits received at the previous trial. Defendant filed a brief and narrative written statements by Dr. Peter O. Steiner, an economist, on market definition and monopoly power and on supply availability and monopoly power; by Stephen J. Clarke, a paralegal, analyzing plaintiff's inventory of mailing machines during the period 1971–76; and by Robert N. Hoffman, assistant to defendant's vice-president–service, regarding the monopoly power issue. On August 28 and September 3 and 4, 1980, the monopoly power issue was tried to the Court, the parties having waived a jury on the issue. Dr. Steiner and Mr. Hoffman appeared, their statements were received as exhibits and they were examined and cross–examined by counsel. Mr. Clarke's statement was received by stipulation. Plaintiff subsequently submitted proposed findings of fact and conclusions of law.

Plaintiff Pacific Mailing Equipment Company ("PME") is a closely–held corporation which has been in business since 1967. PME acquires and reconditions used Pitney Bowes mailing machines. It sells, leases, rents and services these used mailing machines in the Greater Los Angeles area.

Defendant Pitney Bowes is a Delaware corporation with its principal office in Stamford, Connecticut. It engages in business throughout the United States and is the largest manufacturer of mailing machines and postage meters in the world.

Mailing machines are used in conjunction with postage meters which print prepaid postage on mail matter before it is deposited into the United States Mail. They support and facilitate the operation of the associated meter by feeding, moistening and closing mail impressed with postage by the meter.

The postage meter is a sealed unit which remains the property of defendant and is leased to customers in conformity with regulations of the United States Postal Service. Certain types of postage meters (so–called stand alone meters, also referred to as DMs or 5700 series) are suitable for use without a mailing machine. Others are attached to mailing machines. Only Pitney Bowes meters are compatible for use with Pitney Bowes mailing machines. Postage meters are manufactured by Pitney Bowes, F.M.E. Corporation and Postalia, Inc.; each manufacturer's meters couple only with mailing machines it has manufactured.

Customers who purchase or lease a used machine from PME must contact one of defendant's branch offices in the Los Angeles area to arrange for rental and installation of a Pitney Bowes Postage meter.

### The Relevant Market–General

■ To establish its monopolization claim under Section 2 of the Sherman Act, plaintiff has the burden of proving three elements:

1. Possession of monopoly power in the relevant market;

2. Willful acquisition[2] or maintenance of that power; and

3. Causal injury cognizable under the antitrust laws.

*Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919 (9th Cir. 1980); *United States v. Grinnell*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). At this stage of the litigation, the sole issue to be decided is whether defendant possessed monopoly power, this being the power to control prices or exclude competition in the relevant market. *United States v. DuPont*, 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956).

### The Relevant Geographical Market

The starting point of the analysis is the determination of the relevant market. The parties agree that the geographical area in which plaintiff and defendant compete is substantially limited to the Greater Los Angeles Area. Neither side has offered evidence or made a claim that the presence of monopoly power should be tested with reference to any other geographical area. Accordingly, the Court determines that the Greater Los Angeles Area is the relevant geographical market.

### The Relevant Product Market

Plaintiff contends that the relevant product market consists of the retail placement (including sale, rental and lease) of new and used mailing machines. Used machines include those that have been reconditioned or rebuilt prior to placement.

Defendant rejects this definition, contending instead that the relevant market is the market for mailing services. Defendant argues that customers choose among many options besides mailing machines to obtain mailing services. These alternatives include postage stamps, prestamped envelopes, and permit mail. Defendant also defines two relevant submarkets: the market for mailing machine services and the market for the services of used mailing machines.

■ The relevant market for determining whether monopoly power exists consists of those products or services which are reasonably interchangeable by consumers for the same purpose. *United States v. Du-Pont*, 351 U.S. at 395, 76 S.Ct. at 1007; *United States v. Grinnell Corp.*, 384 U.S. at 571, 86 S.Ct. at 1704. Defendant argues that postage stamps applied by hand and stand alone postage meters (not associated with mailing machines) are all reasonably interchangeable with mailing machines. Undoubtedly there are consumers of mailing services on the edge of the market whose economic circumstances may make it feasible to use either stamps, stand alone meters or mailing machines. Generally speaking, however, senders of small volumes of mail are likely to find mailing machines to be uneconomical while large volume senders would find them nearly indispensable. In other words, the needs of consumers of mail services vary directly with the volume of mail they send, precluding a high degree of interchangeability across much of the market.[3] There is, therefore, a distinct submarket consisting of consumers of mailing services for whom mailing machines have no close substitute.[4]

---

2. Plaintiff makes no claim that defendant, if it has monopoly power, acquired it other than by lawful means.

3. The Court does not consider the alternative of doing without mailing machines to be properly includable within the relevant market. See, for example, testimony at RT 934, 1722. That choice is available to some degree to consumers in nearly every market; to incorporate it in the relevant market analysis would lead to ridiculous results. The relevant consideration therefore is not the degree of elasticity for a particular product or service but "the 'cross–elasticity' of demand in the trade" . . . for

"commodities reasonably interchangeable by consumers for the same purposes . . . ." *United States v. du Pont & Co., supra*, 351 U.S. at 394–395, 76 S.Ct. at 1007; *see also Murphy Tugboat & Co. v. Shipowners & Merchants Towboat Co., Ltd.*, 467 F.Supp. 841, 849 (N.D. Cal.1979) (on appeal).

4. The durability and resistance to obsolescence of Pitney Bowes mailing machines does not affect this conclusion. It may well be that those characteristics enlarge somewhat the choices available to prospective customers in that retaining (and perhaps overhauling) one's existing machine or buying a used machine

The instant case is analogous to *United States v. Grinnell Corp., supra,* in which the defendant argued that other modes of property protection services, such as guards and alarms, should be included in the relevant market along with accredited central station service. The Court disagreed, stating that "the high degree of differentiation between central station protection and the other forms means that for many customers, only central station protection will do." 384 U.S. at 574, 86 S.Ct. at 1706. Justice Fortas in his dissent observed:

> I do not suggest that wide disparities in quality, price and customer appeal could never affect the definition of the market. But this follows only where the disparities are so great that they create separate and distinct categories of buyers and sellers.

384 U.S. at 593, 86 S.Ct. at 1715. This clearly is such a case.

The Supreme Court adopted the same reasoning in identifying a separate market consisting of the cluster of services and products offered by full–service commercial banks. *United States v. Phillipsburg Nat. Bank,* 399 U.S. 350, 360, 90 S.Ct. 2035, 2041, 26 L.Ed.2d 658 (1970). Although some of these services were available from other financial institutions, some customers would not have had access to certain products or services except through full–service banks. *See also International Boxing Club v. United States,* 358 U.S. 242, 250–57, 79 S.Ct. 245, 250–53, 3 L.Ed.2d 270 (1959) (separate identifiable market consisting of championship boxing contests, based on higher admission prices and existence of a distinct demand for radio, television and motion picture rights); *Times–Picayune v. United States,* 345 U.S. 594, 611–12, 73 S.Ct. 872, 881–82, 97 L.Ed. 1277 (1953) (newspaper advertising market separate from advertising using other media); *but see Twin Cities Sportserv. Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264, 1274 (9th Cir. 1975).

■ Defendant argues that if a relevant submarket consisting of mailing machines is found, it should be limited to used machines because plaintiff does not compete in the placement of new machines. Defendant contends that the pattern of substantial price differences between new and used machines shows that the two classes of product do not compete in the same market. Substantial evidence, however, indicates that new and used machines are considered by customers to be reasonably interchangeable alternatives and by the trade to be in competition.[5] It appears that a prospective customer has a wide range of choice depending on the type of new machine and the age, type and condition of the used machine desired; no distinct break in the range of prices has been shown which would indicate the existence of a separate, cognate market for used machines.[6] *See Telex Corp. v. International Business Mach. Corp.,* 510 F.2d 894, 916–19 (10th Cir. 1975), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975) (high cross elasticity of demand between IBM compatible and non–compatible peripheral equipment because of ease of adaptation).

from a private party may for some customers be a satisfactory alternative to acquiring a new one. There remains, nevertheless, a distinct submarket for newly acquired machines (new or used) in which plaintiff and defendant compete and in which monopoly power may exist.

**5.** Defendant's salespersons, for example, offer reconditioned machines when they encounter resistance in trying to sell a new machine (TR 280, September 4, 1980). See also defendant's trial brief and submission on the monopoly power issue:

> The evidence offered by plaintiff's trial witnesses confirms that new and used mailing machines compete in the mailing services market. (p. 21; see also p. 26)

Dr. Steiner, defendant's expert witness, testified that Pitney Bowes and PME "compete with each other by both competing against the machines already owned or leased by customer[s]." Ex. 2001, p. 19. Dr. Steiner specifically rejected the idea of a submarket for "services of new mailing machines," *Id.* at 22.

**6.** While prices of rebuilt machines usually average 30 to 60% of new models (TR 1484, October 17, 1979), the prices of some used models presumably approach the prices of less expensive new models. Thus a customer may have a realistic choice between a sophisticated used machine and a simpler new machine for nearly the same price.

The Court concludes therefore that the market for the retail placement of new and used mailing machines constitutes a relevant submarket for purposes of this case.

### Existence of Monopoly Power

Whether monopoly power exists in the relevant market depends on a variety of factors. The existence of such power may be inferred from a predominant share of the market, *United States v. Grinnell Corp.*, 384 U.S. at 571, 86 S.Ct. at 1704, but other factors must be considered as well. *Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.*, at 919.

Plaintiff offered Exhibits 346 and 346A, which had been received at the previous trial, as evidence of Pitney Bowes' market share.[7] These exhibits summarize the quantity of mailing machines placed by Pitney Bowes in the Greater Los Angeles area during the period 1971–1976 and the estimated quantity placed by PME and by all other firms actively engaged in that business during the period. The volume of

placements by the other firms was derived from estimates testified to by persons associated with the various firms. Based on these exhibits, defendant's share of the relevant market was in excess of eighty percent if the so-called stand alone meters are included and approximately seventy–five percent if they are excluded.[8]

The validity of these exhibits is confirmed by other information in the record. An analysis by defendant of a representative sample of active and inactive customer files maintained by its Los Angeles branch shows that at least ninety percent of all new and used Pitney Bowes mailing machines placed in the Los Angeles area from before 1971 through 1978 were placed by defendant and less than ten percent by others.[9] Monopoly power, of course, is not to be measured by reference to the monopoly a manufacturer has over its own products. In this case, however, these data become significant because during the period in issue about 95 percent of all postage meters in service in the United States were

**7.** Defendant attacks the validity and reliability of these exhibits on a variety of grounds. Those objections were available and, to the extent raised, considered and rejected by Judge Wollenberg at the prior trial. Although the exhibits are derived from estimates, the estimates themselves came from individuals who worked for the firms whose volume they estimated, based on their recollection and in some cases contemporary records. The exhibits therefore have a factual basis and cannot be regarded as speculative. They are, moreover, substantially corroborated by other evidence in the record.

**8.** The parties disagree whether stand alone meters should be included in the mailing machine

market. Technically, a meter is not a mailing machine. It does, however, serve a similar purpose by relieving the user of having to use the stamp and tongue method. An optional moistening attachment also provides a stand alone meter with the capacity of moistening envelopes for sealing. Such a meter therefore will meet the needs of a segment of the market for improved mailing services.

It is not necessary, however, to make a definitive ruling on the issue inasmuch as the difference in the magnitude of the market shares, given all of the facts, would lead to no different result.

**9.** Plaintiff's Exhibit 503 shows the following:

| | Base Year 1971 | 1972 | 1973 | 1974 | 1975 | 1976 | 1977 | 1978 | Total |
|---|---|---|---|---|---|---|---|---|---|
| PB New Customer Installations | 506 | 46 | 59 | 75 | 68 | 75 | 73 | 14 | 916 |
| PB Replacement Installation | 72 | 33 | 38 | 52 | 48 | 48 | 72 | 8 | 371 |
| Total Placements by PB LA Branch | 578 | 79 | 97 | 127 | 116 | 123 | 145 | 22 | 1287 |
| Placements by others than PB LA Branch * | 72 | 8 | 10 | 12 | 11 | 13 | 13 | 2 | 141 |
| Total Placements | 650 | 87 | 107 | 139 | 127 | 136 | 158 | 24 | 1428 |

* These figures include placements not only by competitors such as plaintiff but also by any other Pitney Bowes branch.

manufactured and supplied by Pitney Bowes.[10] Inasmuch as Pitney Bowes meters can only be used with Pitney Bowes mailing machines, this figure supplies a meaningful indication of defendant's national market share of mailing machines, and of the minimal share held by the other two manufacturers.[11] That defendant's share of new and used Pitney Bowes placements in the Los Angeles area has been over ninety percent, and that this share has not varied significantly since before 1971, is therefore probative of its dominant share of the entire market for new and used mailing machine placements.

Defendant contends that annual placement figures are not a meaningful measure of monopoly power where, as here, large numbers of machines are now in service outside of defendant's control. Defendant points out that it has been selling mailing machines for fifty years and that many machines sold fifteen to twenty years ago are still in service. Those machines not only provide mailing services to their owners but, through sale or exchange, are a potential source of services to others. It seems somewhat farfetched to suppose, however, that owners of Pitney Bowes machines would sell their machines on the market in volume sufficient to affect defendant's market position. That they have not done so in the past is demonstrated by Plaintiff's Exhibit 503, which, on the basis of meter records, shows that less than ten percent of Pitney Bowes machine placements were made by sources other than Pitney Bowes.[12] There is no basis on this record for a finding that whatever market power defendant derives from its share of placements is inhibited by the machines now in service.

■ The existence of market power may therefore be inferred from defendant's share of over seventy–five percent of the

relevant market. That inference is strengthened here inasmuch as that share has long been held and there are no other participants of any size in the market. See United States v. Grinnell, 384 U.S. at 571, 86 S.Ct. at 1704; Pac. Coast Agr. Export Ass'n. v. Sunkist Growers, Inc., 526 F.2d 1196, 1204 (9th Cir. 1975), cert. denied, 424 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976) (Sunkist's share of the relevant export market ranged from 45 to 70%; no single competitor controlled more than 12% of the market after Sunkist's entry), American Tobacco Co. v. United States, 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946) (defendants controlled two thirds of the entire domestic market of cigarettes and 80% of comparable cigarettes), Greyhound Computer v. Intern. Business Machines, 559 F.2d 488, 496–7 (9th Cir. 1977), cert. denied, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978) (IBM's share of the relevant market ranged from 82 to 64%, with the balance of the market dispersed among firms none of which held more than 4%); United States v. United Shoe Machinery Corp., 110 F.Supp. 295, 297 (D.Mass.1953), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954) (defendant supplied more than 75% of the demand for shoe machinery), Union Carbide & Carbon Co. v. Nisley, 300 F.2d 561, 573 (10th Cir. 1961) (defendants supplied 80% of vanadium ore).

The inference of market power is further reinforced by evidence of certain of defendant's policies and practices. See Greyhound Computer v. Intern. Business Machines, 559 F.2d at 497; United States v. United Shoe Machinery Corp., 110 F.Supp. at 297, 340–41, 343. There is no need to undertake an examination and discussion of all arguably relevant policies and practices; a few examples will suffice.

First, defendant has pursued a policy of destroying substantially all used mailing machines above a certain age taken in trade

---

**10.** See Plaintiff's Exhibit 505.

**11.** As previously noted, some postage meters are used without mailing machines. When a mailing machine is used, however, it is used in association with a meter furnished by the same

manufacturer. It is reasonable to infer that defendant's share of mailing machines in place in the market does not vary greatly from its share of meters in place.

**12.** See note 9, supra.

before disposing of them as scrap. Except for a small number of machines which were reconditioned and sold to customers upon request, defendant destroyed all machines more than one year old until 1970, and all machines more than three years old until 1977. Since 1977, it has generally destroyed machines over seven years old after a thirty day period during which they are offered for sale to used equipment dealers.[13] A branch manager personally supervises the destruction to ensure that the machine is rendered incapable of being restored. Until 1977, defendant sold no used machines to competing retail dealers.

A variety of reasons for the destruction policy were offered at trial:

the lack of economic value of used machines;

the cost of storage;

the fear of theft by employees and of having the same machine used as a trade–in more than once; and

the concern over misuse of components of mailing machines which actuate the postage meter.

These matters may indeed have been legitimate concerns warranting appropriate action. The Court is not persuaded, however, that they would have justified the costly procedure followed by defendant had defendant's primary purpose not been to keep the used machines off the market.

Second, defendant's record–keeping functions as a postage meter manufacturer have enhanced its market power. Postal regulations require a postage meter manufacturer to retain title to each meter it manufactures and to lease it to users subject to extensive safeguards against misuse. *See* U. S. Postal Service, Domestic Mail Manual, 39 CFR § 144.952. Among those safeguards is a requirement that the manufacturer retain a record of the location of each meter. 39 CFR § 144.952(h). Inasmuch as mailing machines are used in conjunction with meters, defendant's records show the location of every Pitney Bowes mailing machine in operation, regardless of whether the user acquired it from defendant or from another dealer. To implement this requirement, defendant's service personnel perform periodic inspections on all meters in service. In this manner defendant gains a complete record of and regular access to all customers of competing suppliers of used Pitney Bowes mailing machines. See, e. g., R.T. 63–68. The resulting competitive advantage inevitably enhances defendant's market power. Cf. *Greyhound Computer v. Intern. Business Machines*, 559 F.2d at 497 (evidence that IBM set prices without regard to competition and IBM's dominant base of installed equipment which created barriers to entry at the manufacturing level supported an inference of market dominance).

Whether defendant, by pursuing practices such as these, acted to maintain or misuse its monopoly power in violation of Section 2 is not an issue presently before the Court. It is open to defendant at the subsequent trial to attempt to show that defendant's business practices were not unreasonably restrictive of competition. *Cal. Computer Products v. Intern. Business Machines*, 613 F.2d 727, 736–737 (9th Cir. 1979); *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1947). The Court makes no findings on the point.

But whether lawful or not, these practices, when viewed in the light of defendant's dominant market position, are evidence that defendant possessed monopoly power. In the aggregate, they reflect substantial control over price and over access of competitors to the market. *See Pac. Coast Agr. Export Ass'n v. Sunkist Growers, Inc., supra*, 526 F.2d at 1204.

The Court therefore finds and concludes that defendant possessed monopoly power, i. e., the power to control prices or exclude competition, in the market for new and used mailing machines in the Greater Los Angeles Area. The jury will be instructed accordingly.

**13.** See Plaintiff's Exhibits 15, 16, 26, 27, 28, 331.

## EXHIBIT A

Good cause appearing, it is hereby ordered:

### 1. *Discovery.*

(a) All discovery is hereby terminated except as hereafter ordered. No responses to outstanding discovery shall be required. Discovery shall be permitted only upon stipulation of the parties or for good cause shown.

(b) Plaintiff shall produce at a mutually convenient time and place the so–called 3 × 5 and pink cards now in existence.

### 2. *Severance and Stay.*

(a) Civil Action 80–0067 is severed from Civil Action 75–2673 and proceedings in the former action are stayed until further order except as herein provided. Defendant's counterclaims and plaintiff's counter–counterclaim are severed and further proceedings therein stayed.

(b) The first claim in Action 80–0067 is consolidated for trial with Action 75–2673 and shall be treated as a supplemental complaint subject to the following limitations:

(i) Plaintiff shall be permitted to present proof

(1) that antitrust violations shown to have occurred prior to the filing of Action 75–2673 caused continuing damage to plaintiff subsequently, and

(2) that antitrust violations shown to have occurred prior to the filing of Action 75–2673 continued in effect thereafter and caused subsequent damage to plaintiff.

(ii) Plaintiff shall not be permitted to present proof of new and distinct antitrust violations occurring after the filing of Action 75–2673 as a basis for recovery.

(iii) Nothing herein is intended to preclude the receipt of otherwise admissible evidence of acts or conduct occurring subsequent to the filing of Action 75–2673 to the extent relevant to the issues of market or intent.

### 3. *Limitation and Severance of Issues.*

(a) Relevant market and market share. Pursuant to stipulation of the parties in open court, the issue of relevant market(s) and defendant's market share shall be submitted to the Court for decision according to the following schedule:

(i) Not later than August 14, 1980, each party shall serve and file designations of the relevant pages of the trial transcript and of relevant trial exhibits, together with a brief on the issue. In addition, the parties may offer additional testimony which shall be prepared in narrative statement form and served and filed not later than August 14, 1980.

(ii) A hearing shall be held on August 28, 1980 at 10 a. m. for the cross–examination of any witness whose testimony is being offered in addition to the trial record, and for argument of counsel.

(iii) The Court will issue findings on the issues of relevant market(s) and market share which shall serve as a basis for instructions to the jury on those issues at the trial. The parties have stipulated that findings on these issues based on evidence relating to the period 1970–1976 shall be considered by the jury to be equally applicable to the period 1976–1980.

(b) Motions for partial summary judgment. The parties may file motions for partial summary judgment for the limitation of issues not later than August 29, 1980. Responses shall be due September 12, 1980. Argument shall be heard on September 19, 1980, in conjunction with the pretrial conference.

(c) All issues relating to equitable relief are severed for trial before the Court as necessary following conclusion of the jury trial.

### 4. *Trial Briefs.*

(a) Plaintiff shall serve and file on July 21, 1980, a detailed statement of contentions, listing separately each factual contention it expects to prove at the trial before the jury with a reference to the supporting witness or document, together with a trial

brief. The format shall follow generally § 3.30 of the Manual for Complex Litigation.

(b) Defendant shall serve and file a similar responsive statement of contentions and trial brief by August 18, 1980, limited to the issues to be tried to the jury.

(c) The Court will not accept statements of contentions in argumentative, as opposed to factual form.

5. *Damages.*

(a) Plaintiff shall serve and file by August 4, 1980, all damage exhibits it expects to offer at the trial in the form in which they will be offered. No other or different damage exhibits will be received at the trial in the absence of good cause. The exhibits shall be fully annotated to reflect the specific source for each figure and computation reflected in the exhibit and the underlying source materials shall be made available for inspection and copying to opposing counsel concurrently.

(b) Plaintiff's expert witnesses, if any, on the damage issue shall be tendered for deposition during the period August 4 through September 2, 1980.

(c) Defendant shall serve and file any exhibits it proposes to offer on the damage issue (but not including the counterclaim) by September 2, 1980. If defendant proposes to offer expert testimony on this issue, it shall tender its experts for deposition during the period September 2 through 16, 1980. Underlying source materials shall be made available concurrently.

6. *First Pretrial Conference.*

(a) A pretrial conference will be held September 19, 1980, at 3 p. m.

(b) On September 15, 1980, the parties shall serve and file their final list of witnesses and exhibits proposed to be offered at the trial. The parties shall be prepared at the conference to explain the necessity for each witness and document and to show cause why testimony or exhibits shall not be excluded as being cumulative or redundant.

7. *Exchange of Exhibits and Designations.*

(a) To the extent not previously marked and exchanged, all exhibits to be offered at trial shall be premarked and exchanged, and one set provided to the Court, by September 15, 1980.

(b) On September 15, 1980, the parties shall serve and file designations (by page and line) of deposition excerpts to be offered at trial (other than for impeachment). Interrogatory answers and responses to requests for admissions to be used at trial shall be offered in the form of exhibits; the proponent shall present a copy of the interrogatory or request and the response which together shall be premarked as an exhibit and shall have been exchanged with other exhibits.

8. *Objections and Motions in Limine.*

(a) The parties shall file and serve by September 22, 1980, motions setting forth any objections to any proposed exhibit or testimony and, briefly, the reason therefor.

(b) The Court will hold a hearing on all such objections, together with a final pretrial conference, on September 26, 1980, at 3 p. m.

9. *Jury Instructions and Voir Dire.*

(a) The parties shall file and serve by September 22, 1980, proposed voir dire questions, jury instructions and verdict forms. Jury instructions shall be brief, simple and non–argumentative and shall be limited to subjects not adequately covered by the Court's standard instructions. Argumentative instructions will be rejected.

(b) The parties shall submit at the same time a joint statement of undisputed facts for use by the Court in instructing the jury. In the event no statement is received, the Court may refer to the parties' previously filed pretrial statements for this purpose.

10. *Trial.*

(a) Trial shall commence before a jury on Tuesday, October 14, 1980, at 9:30 a. m. The issues shall be bifurcated as follows:

(b) The issues involving defendant's liability shall be tried and decided first.

(c) In the event a verdict of liability is returned trial shall resume before the same jury on the issue of damages.

(d) Following a verdict on the damage issue, if necessary, trial shall commence before the court on issues of equitable relief.

11. *Jury.*

A jury of eight persons shall be selected. All those remaining at the time the case is submitted to the jury, but not less than six, shall serve as jurors.

12. *Local Rules–Service.*

Except as herein provided, compliance with Local Rules 235 and 245 is excused. Service required by this order shall be by hand–delivery not later than the date specified.

### RULING ON OFFER OF PROOF

Pursuant to order of the Court, plaintiff has submitted its offer of proof on damages and defendant has filed its response.[1] While the response asks dismissal of the action on the ground of insufficiency of the damage proof, the Court will treat it as an objection and motion in limine. A hearing was held on the admissibility of plaintiff's damage proof on September 10, 1980. At the hearing the Court questioned plaintiff's counsel at length concerning the elements and evidentiary foundation of plaintiff's damage claim and afforded both sides an opportunity to be heard on the admissibility of the tendered proof.

The exhibits submitted by plaintiff were simply pro forma profit and loss statements, entirely unannotated and totally failing to reflect their source or the underlying computations. Because exhibits of this kind in complex antitrust litigation (1) prevent defendant from being fairly able to meet plaintiff's damage proof and (2) confront the jury with confusing arrays of figures with which they are not competent to deal, and because plaintiff's non-compliance was conscious and deliberate, the Court, in accordance with the prior order, precluded plaintiff from offering any damage *exhibits* at the trial.

Plaintiff's damage claim consists of four separate categories which may be summarized as follows:

(1) Damages suffered as a result of identifiable lost sales, rentals and leases.

(2) Expenses incurred as a result of conduct of defendant, such as reimbursement of inspection and service charges assessed by defendant against plaintiff's customers.

(3) Increased overhead expenses resulting from the expenditure of unreimbursed service time in correcting situations created by defendant. This item includes increased travel, freight and telephone expense to locate used mailing machines. These costs aggregate about $17,000. In addition plaintiff attributes a loss of business to the diversion of an estimated five percent of management time to deal with problems created by defendant, resulting in a loss of $89,000 in net income.

(4) Loss of profit resulting from the loss of sales of mailing machines and follow–on sales of related equipment. This claim is based on the premise that but for defendant's conduct, one out of every two mailing machines sold, rented or leased in the Los Angeles market would have been a used machine.

■ Although the offer of proof is presented in a singularly confusing manner, the Court, with the benefit of oral argument, finds it sufficiently comprehensible to permit it to make this ruling. The Court has no particular difficulty with the first

1. Submission of the offer of proof was ordered by the Court when plaintiff failed to submit proposed damage exhibits complying with paragraph 5(a) of the pretrial order filed July 3, 1980.

That paragraph provided:

5. *Damages.*

(a) Plaintiff shall serve and file by August 4, 1980, all damage exhibits it expects to offer at the trial in the form in which they will be offered. No other or different damage exhibits will be received at the trial in the absence of good cause. The exhibits shall be fully annotated to reflect the specific source for each figure and computation reflected in the exhibit and the underlying source materials shall be made available for inspection and copying to opposing counsel concurrently.

three claims. Plaintiff is clearly entitled to prove loss and damage suffered as a result of lost sales, increased expenses and diversion of sales and management effort. Whether the particular amounts asserted, especially the loss due to the claimed five percent diversion of effort, can be sustained by evidence must be resolved at trial. There is no basis at this stage of the proceeding for excluding or limiting proof in support of those claims.

Plaintiff's fourth claim presents a different problem. It is based on a baldly stated premise that in an unrestrained market one out of every two mailing machines placed in the market would have been a used machine. Plaintiff then constructs an assumed distribution of sales among the various types of mailing machines, projects its assumed share of this used market, and computes the "lost profits" resulting from these "lost sales."

The only support for the premise proffered by plaintiff is the opinion testimony of four witnesses, including plaintiff's president Keatinge, based on their experience in the Los Angeles mailing machine market, that in an unrestrained market half of the mailing machines sold would have been used machines. Counsel confirmed at the hearing that plaintiff proposes to offer no supporting studies, analyses, comparisons, or other factual, objective, observed or verifiable data of any kind.

The question before the Court, therefore, is whether an opinion lacking any factual support should be permitted to go to the jury to form the keystone of plaintiff's damage computation.[2] The courts have repeatedly held that such "speculation or guesswork", *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124, 87 S.Ct. 1562, 1577, 23 L.Ed.2d 129 (1969), must be excluded in a jury trial.

The judge properly excluded this evidence. No basis had been established for the assumption that but for United's unlawful acts Schwabe's proportion, not only of clicking machines in the shoe market, but of each and every type of shoe machinery marketed by United, would have approximated in the six years, 1954–1959, the 15.54% asserted to represent Schwabe's 1956 share of the clicking machines in the non–shoe market.

*Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 911 (2d Cir.), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962).

One of Lessig's contentions concerning the exclusion of evidence relating to this phase of the case merits comment. Lessig complains that he was not permitted to state his opinion as to the profit which he lost as a result of Tidewater's alleged conduct. Such opinion testimony is admissible, but only if based upon facts which rationally support it. The offer of proof was simply that it was Lessig's opinion, based upon his experience and knowledge, that but for Tidewater's restrictive practices his earnings would have approximated seven hundred dollars a month, or about four hundred dollars per month more than he in fact averaged. There was no offer to show how his estimate was made. The testimony was inadmissible, absent this foundation, and it was excluded upon that express ground.

*Lessig v. Tidewater Oil Company*, 327 F.2d 459, 473–4 (9th Cir.), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964) (footnotes omitted). *See also Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1360–61 (9th Cir. 1976), *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 86–87 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), *Volasco Products Co. v. Lloyd A. Fry Roofing Co.*, 308 F.2d 383, 390–93 (6th Cir. 1962), cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963), *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 392–4 (9th Cir.), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957), *cf. Pacific Coast Agr. Export Ass'n. v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1206–07 (9th Cir. 1975), cert. denied, 425 U.S. 959, 96 S.Ct. 1741, 48

---

**2.** The effect of the use of that premise is to increase plaintiff's sales during the 1971–1980 damage period from $3,549,610 to $13,441,215 and its net profit from $125,650 to $3,193,668.

L.Ed.2d 204 (1976), *Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894, 897, 903–04 (5th Cir. 1973).

Plaintiff argues that this is market exclusion case. It proffers no authority, however, to support the admission of a wholly speculative damage theory in such a case.

To meet the minimum requirement of proof in a market exclusion case in which lost profits are sought, plaintiff must normally produce evidence falling into one of the following categories:

(1) Comparison of plaintiff's performance before and after the wrongful conduct under otherwise similar conditions; *Bigelow v. RKO Radio Pictures, Inc.* [327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946)]; *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 376–78, 47 S.Ct. 400 [404.05], 71 L.Ed. 684 . . . (1927); *Pacific Coast Agricultural Export Association v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1206–07 (9th Cir. 1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 . . . (1976);

(2) Comparison of performance in restrained and unrestrained markets which are otherwise comparable; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Bigelow v. RKO Radio Pictures, Inc.*, supra, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Richfield Oil Corp. v. Karseal Corp.*, 271 F.2d 709, 714–15 (9th Cir. 1959), *cert. denied*, 361 U.S. 961, 80 S.Ct. 590, 4 L.Ed.2d 543 (1960); or

(3) Loss of specific business or customers; *Herman Schwabe, Inc. v. United Shoe Machinery Corp., [supra]*.

*Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co., Ltd.*, 467 F.Supp. 841, 863 (N.D.Cal.1979) (on appeal).

■ While the owner of a business may be permitted on the basis of adequate records to express an opinion about the value or performance of his business, the Court is aware of no authority for permitting him to express, solely on the strength of his experience, an opinion such as the potential distribution of sales between new and used machines in an unrestrained Los Angeles market. Such expertise as he may have acquired with respect to his business of selling mailing machines does not qualify him to express an opinion concerning the prospective behavior under greatly changed conditions of the many buyers and sellers in that market.[3]

Plaintiff can claim no surprise by this ruling. In the course of the prior trial, Judge Wollenberg expressed his doubts about the admissibility of this claim. After the case was reassigned, this Court raised the damage issue on several occasions and admonished plaintiff concerning the necessity of having evidence to support the premises for its damage claim and disclosing such evidence sufficiently in advance of trial to permit adequate discovery. Plaintiff has declined to abide by this admonition. In addition, counsel for plaintiff here was counsel for defendants in *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co., Ltd.* and hence should be well aware of the requirements applicable to damage proof in this type of case.

For the reasons stated, the Court hereby rules that plaintiff will be precluded from presenting to the jury any claim for dam-

---

**3.** Without touching the merits of the premise, it is nevertheless indicative of its extremely speculative nature that it subsumes the following assumptions:

The total Los Angeles market share of Pitney Bowes, a large and long established manufacturer with a nation–wide sales organization and great resources and experience, would decline from ninety to fifty percent while the share of plaintiff, a small retail and service establishment, would increase to about 25 per cent.

This reallocation of the market would occur without change in the price structure, allowing plaintiff to continue to reap the same per machine profit notwithstanding a much larger volume and the presumably vigorous competition of Pitney Bowes.

Finally, it is assumed that notwithstanding the substantial increase in the market for used machines, Pitney Bowes, although it receives many used machines as trade–ins, would not enter that segment of the market. *See Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d at 911.

ages (such as the fourth claim here described) premised upon a general or relative increase in the placement of used (including reconditioned and rebuilt) mailing machines in the greater Los Angeles market. Admissible damage evidence will be limited to the first three claims described above.

IT IS SO ORDERED.